GERALD A. GALUSHA, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 17256-90.     Filed September 4, 1990.

*F. Michael Kovach,* for the petitioner.
*Milton J. Carter, Jr.,* for the respondent.

OPINION

GERBER, *Judge:* Petitioner seeks to stay the sale of a boat under section 6863(b)(3).[1] Respondent, under section 6861, made a jeopardy assessment on June 1, 1990, for an amount in excess of $223,000. Petitioner purchased, on March 20, 1990, for $72,500, a boat which respondent seized pursuant to the jeopardy assessment. Respondent advertised the boat to be sold on August 1, 1990. On July 27, 1990, respondent mailed a notice of deficiency to petitioner. On July 31, 1990, petitioner filed a petition and also moved to stay the sale. The specific issues raised in this controversy are: Whether the boat in question (1) is "perishable" (section 6336), or (2) may become "greatly reduced in price or value" (sections 6863(b)(3)(B)(ii) and 6336), or (3) "cannot be kept without great expense" (sections 6863(b)(3)(B)(iii) and 6336). We consider here for the first time the meaning of the term "perishable" as used in section 6336.

The boat involved is a 47-foot vessel named *Anna.* It is a wood-hulled cutter constructed in 1966 at the Morgan Shipyards of New Zealand. After the boat was seized, respondent placed it in drydock pending the August 1, 1990, proposed sale. On July 16, 1990, respondent notified

---

[1] All section references are to the Internal Revenue Code of 1986 as amended and in effect for the period in controversy. Rule references are to this Court's Rules of Practice and Procedure.

petitioner that the *Anna* was "perishable" and that it would be sold if petitioner did not post bond for $43,500. On July 17, 1990, petitioner received a similar notice, but it required the posting of a $72,500 bond to stay the August 1, 1990, sale of the *Anna.*

Respondent, in opposition to petitioner's motion to stay the sale, set forth the following background facts:

1. During the years 1984 through 1988, petitioner was self-employed as a fiberglass repairman.

2. At least during 1989, and probably before, Mr. Galusha was involved in a sophisticated marijuana "grow" operation at his previous residence, 11030 173rd Avenue S.E., Renton, WA. On February 3, 1989, police officers searched that residence under a search warrant. During the search, they discovered a 12 foot travel trailer with a hidden stairway that led to two underground rooms where marijuana was grown by Mr. Galusha. In those two rooms, each 30 feet by 15 feet, police found over 400 growing plants, 151 of which were ready for harvest. The police estimated that the street value of the marijuana seized was $708,000.00. Information available to the police officers indicated that Mr. Galusha had recently made a down payment on land in the Cayment [sic] Islands. During the search of Mr. Galusha's residence, the police found completed and signed Federal Income Tax Returns, Forms 1040, for Mr. Galusha for the taxable years 1984 through 1987.

3. On March 15, 1989, Mr. Galusha pleaded guilty of violating the Uniform Controlled Substances Act of the State of Washington, and was sentenced to one year confinement at work release.

4. On March 8, 1990, Mr. Galusha sold his former residence, which had been the site of the marijuana "grow" operation, for net proceeds of $141,340.14. Mr. Galusha used $72,500.00 of the proceeds to purchase the vessel Anna, and the remainder was wire transferred to an unk[n]own location. The vessel Anna was purchased on March 20, 1990.

5. On March 30, 1990, Mr. Galusha entered into a sublease at the Shilshole Bay Marina for the vessel Anna for a period of April 1, 1990, to July 1, 1990.

6. On May 2, 1990, Galusha told his Corrections Officer that he did not own a sailboat. At the time of that statement, Mr. Galusha was the owner of the vessel Anna, moored in Seattle, Washington.

7. On May 18, 1990, Mr. Galusha wrote Mr. G. Allen Hooker, Senior Revenue Officer for the Washington State Department of Revenue, and informed him that he had purchased a boat in the state of Washington, but that the boat had been moved to the Cayman Islands. At the time of this letter, Mr. Galusha owned the vessel Anna, which was moored in Seattle, Washington.

8. On June 1, 1990, Mr. Galusha met with his Correction[s] Officer, David Conrad. At that meeting, Mr. Galusha told Correction[s] Officer Conrad that he had lied to the Washington Department of Revenue about not having a sailboat. Mr. Galusha admitted that he had lied to the

Washington Department of Revenue, and stated he had so lied because he didn't want to pay state excise tax on the purchase of the boat. Mr. Galusha told the Correction[s] Officer that he had purchased the sailboat for approximately $26,000.00 (rather tha[n] the $72,500.00 actual cost), and that the boat was a "fixer upper". He further told the Correction[s] officer that he was going to hire someone to sail the boat to Canada to avoid paying excise tax to the State of Washington.

9. Shortly prior to June 1, 1990, a jeopardy assessment was made concerning Mr. Galusha's 1984 through 1988 income taxes. On June 1, 1990, the vessel Anna was seized. At the date of seizure, Mr. Galusha told Revenue Agent Patricia J. McLaughlin that the Anna was wood-hulled, and would corrode in the water unless continuously maintained.

10. On June 4, 1990, Revenue Officer McLaughlin met with Mr. Kovach, Mr. Galusha's attorney. Mr. Kovach also informed Revenue Officer McLaughlin that the vessel Anna was wood-hulled, and if stored in the water, that the vessel would corrode.

11. On June 5, 1990, Revenue Officer McLaughlin again met with Mr. Galusha. At that meeting, Mr. Galusha again informed the Revenue Officer that the vessel would corrode if left in the water without continuous maintenance.

12. On June 18, 1990, Revenue Officer McLaughlin telephone[d] Mr. Kovach, Mr. Galusha's attorney, to inform hi[m] that the vessel Anna would have to be moved. Mr. Kovach agreed with Revenue Officer McLaughlin that the storage of the vessel at Seaview East appeared to be the best storage location, but indicated that if the vessel was stored in dry storage at that location for more than three months, that it would become "firewood".

13. Revenue Officer McLaughlin scheduled a sale of the vessel under the provisions of I.R.C. section 6336 to be held August 1, 1990. At Mr. Kovach's request, that sale was postponed in order for him to challenge the sale before [the Tax Court].

This Court has jurisdiction to review and grant or deny applications to stay sale of seized property. Sec. 6863(b)(3)(C); *Williams v. Commissioner*, 92 T.C. 920, 926-927, 931 (1989); see Rule 57. We note that in *Williams v. Commissioner, supra,* the jeopardy assessment was made and the sale of the seized property proposed subsequent to the filing of a petition and commencement of the case in this Court. However, in this case the jeopardy assessment, seizure, and proposal to sell the asset all occurred prior to the filing of a petition and the commencement of the case. Our jurisdiction is contemplated under section 6863(b)(3) in either set of circumstances.

Normally, tax may not be assessed and/or collected with respect to a deficiency until the decision of this Court

becomes final. Sec. 6213(a). Where, however, the Commissioner believes that collection of the tax will be jeopardized, the tax may be immediately assessed and collected (and property may be seized and possibly sold) prior to our decision becoming final. Sec. 6861. Generally, seized property may not be sold while a case is pending in this Court. Sec. 6863(b)(3)(A)(iii). Seized property may be sold, when a case is pending, under the following exceptions: (1) The taxpayer consents to the sale (section 6863(b)(3)(B)(i)); (2) the Commissioner determines that the expenses of conservation and maintenance will greatly reduce the net proceeds (section 6863(b)(3)(B)(ii)); and (3) the property is liable to perish, or that the property will become greatly reduced in price or value by keeping, or that such property cannot be kept without great expense (sections 6863(b)(3)(B)(iii) and 6336). Taxpayers may stay the sale of the seized property by posting bond, which petitioner here either declined or was unable to do. Sec. 6863(a).

In motions to stay sale the taxpayer first must request a stay "on grounds that are plausible and believable" and if the taxpayer meets this preliminary requirement, the Commissioner bears the burden of proving by a preponderance of the evidence that the determination to sell seized property was correct. *Williams v. Commissioner*, 92 T.C. at 935.

Respondent, in notifying petitioner of the proposed sale of the *Anna*, advised that under section 6336 seized property may be sold "if any property seized is liable to perish or become greatly reduced in price or value by keeping, or that the property cannot be kept without great expense." Respondent's notification went on to make the specific and sole determination that "the 'Anna' is perishable." Based upon this determination, petitioner, in his motion to stay sale, alleged that the *Anna* was not "perishable" within the meaning of section 6336. Petitioner further alleged that the *Anna* was "sea-worthy and sound when she was seized, and if properly maintained, can be expected to remain in good condition for many years." Petitioner went on to conclude that "property such as a boat which is designed and constructed to last for decades is not 'perishable.'" We hold

that petitioner's request for a stay was "on grounds that are plausible and believable."

Accordingly, the burden falls upon respondent to prove by a preponderance of the evidence that the determination to sell the seized property meets the statutory standard. *Williams v. Commissioner, supra.* More specifically, respondent must show that the *Anna* is "perishable" within the meaning of section 6336 or he must show some other exception.

*Is the "Anna" "perishable" within the meaning of section 6336?*

Respondent argues that the *Anna* is a wood-hulled boat which will deteriorate if kept in dry storage for "any length of time." Respondent, quoting petitioner's attorney, contends that the *Anna* will turn to "firewood" if stored in dry storage for more than 3 months. In further support of his burden, respondent offered the August 6, 1990, report of a Marine Surveyor which indicated:

The hull below the water line will continue to dry through the Summer heat while being out of the water and it may be more difficult to keep the bilges dry when placed back in the water. It is the opinion of the below surveyor that the vessel should not be kept on dry dock for more than thirty additional days. * * *

Respondent, although admitting that in-water storage would be less damaging, argues that the vessel would steadily deteriorate and should not be kept in the water for more than 6 months without "extensive maintenance."

Petitioner agrees with respondent's argument that if the *Anna* is left out of water "much longer she is likely to suffer severe damage as her wood hull drys out." Petitioner, however, asserts that the *Anna* is out of water only due to respondent's mismanagement and that the *Anna* should not have been taken out of the water. Petitioner points out that any danger relating to the *Anna* drying out can be easily remedied by placing her back into the water. Furthermore, petitioner argues that dry dock storage is more expensive than the cost of mooring the boat in water.

With respect to respondent's contention that "extensive maintenance" would be necessary even if the *Anna* were in the water, petitioner points out that there is no evidence or

showing that the maintenance would be "extensive" or that anything more than routine maintenance would be necessary.

Section 6336, the underlying regulation, and the legislative history in this area do not contain a definition of the term "perishable." Moreover, the only other court opinion in the Federal tax area dealing with the definition of "perishable" applied a common usage approach to the term "perishable." In *Omnibus Financial Corp. v. United States,* 566 F.2d 1097, 1099 (9th Cir. 1977), for example, the court referred to "perishable commodities (*i.e.,* fresh fruits, vegetables, fresh meat, dairy products, frozen foods, and baked goods)" as opposed to "nonperishable items (*i.e.,* canned goods, liquor, a liquor license, and other equipment)."

In its broadest and most general terms "perishable" means subject to decay or deterioration. However, in more common usage the word is defined as "subject to *quick* deterioration or spoilage except under proper conditions (as of temperature or moisture content)." (Emphasis supplied.) Webster's Third New International Dictionary (1963). Similarly, a legal dictionary provides the definition—"Subject to speedy and natural decay (e.g. fruits, vegetables, dairy products, meat). But, where the time contemplated is necessarily long, the term may embrace property liable merely to material depreciation in value from other causes than such decay." Black's Law Dictionary (5th ed. 1979).

Although the more common usage of "perishable" connotes quick or relatively speedy decay, respondent's argument that perishable could mean long-term deterioration is not without some support. In the context of section 6336, however, it is evident that short-term decay or deterioration is intended. First, we accept the basic premise that most personal property is the subject of some deterioration.[2] Accordingly, if the term "perishable," in section 6336, was afforded its broadest use, it would render the section meaningless and obviate the prohibition on sale of seized property during the pendency of a court proceeding under section 6863(b)(3)(A)(iii). Because most property deteriorates, albeit at different rates, respondent could argue that any

---

[2]See, for example, discussion of useful life of railroad diesel locomotives in *Southern Pacific Transportation Co. v. Commissioner,* 75 T.C. 497, 687-702 (1980).

property seized in connection with a jeopardy assessment would come within the "perishable" exception of section 6336 and may be sold during the pendency of a court proceeding to determine the merits of the underlying tax liability—a result which was obviously not intended.

We think that petitioner's position is the one intended in section 6336. That section was intended to address situations where the prohibition on sale of seized property would result in the property being "liable to perish" or becoming "greatly reduced in price or value by keeping." This language implies that the deterioration or decay must be rapid in relation to the amount of time that it may be necessary to hold the property during the resolution of the controversy over the tax deficiency. Based upon the information available in this case, the *Anna* does not deteriorate at a rapid pace. The *Anna* (currently 24 years old) was built in 1966 and was seaworthy when purchased and/or seized with a value (agreed to by both parties) of at least $72,500. The resolution of the tax controversy between the parties may take a year or more, but the *Anna* is not liable to perish in the context of this case.[3]

Although it is agreed by the parties that the *Anna* will deteriorate rapidly and may be "perishable" if kept out of water, that is a condition precipitated by respondent's choice and unilateral action and one which respondent can and is expected to remedy by placing the *Anna* back in the water.

*May the "Anna" become "greatly reduced in price or value" within the meaning of section 6336?*

Although respondent advised petitioner that the sole ground for immediate sale was because the *Anna* is perishable, respondent argued that the *Anna* will become greatly reduced in value if not sold immediately. Respondent argues that the *Anna* would "quickly" deteriorate and/or would be greatly reduced in value if not sold immediately. Respondent bases his argument/conclusion on

---

[3]It should be noted, however, that it may be to the detriment of both petitioner and respondent to delay the sale of property if it is possible that the property is losing value due to the passage of time. Additionally, petitioner is in a position to consent to the sale or to seek a return of the property by posting bond under sec. 6863.

Revenue Officer McLaughlin's statement in her affidavit that "Mr. Galusha informed [her] that the boat was wood-hulled, and would corrode in the water unless continuously maintained." Petitioner counters that respondent has not quantified the reduction in value. Further, petitioner argues that the maintenance necessary may be nominal and/or inexpensive, such as oiling exposed metal parts or other types of routine maintenance, which it can be presumed would not consume the value of the boat over a relatively short span of time in relation to its life. We agree with petitioner. Respondent has failed to show that the *Anna* will be greatly reduced in value if not sold immediately.

We considered this issue in *Williams v. Commissioner*, 92 T.C. at 938, wherein we stated:

The courts have interpreted the language "liable to become greatly reduced in value" to mean "likely" to become greatly reduced in value. See, e.g. *United States v. Mellon Bank,* 521 F.2d 708, 712 n. 15 (3rd Cir. 1975); *Hohman v. United States,* 535 F. Supp 1218, 1219 n. 6 (D.D.C. 1982). We take this to mean that a great loss in value is likely to occur in the foreseeable future. * * *

Respondent here has not shown that "a great loss in value is likely to occur in the foreseeable future." Conversely, respondent offered a valuation, as an exhibit to his opposition to petitioner's motion for a stay of sale, appraising the *Anna* at $75,000 as of August 6, 1990. Because petitioner purchased the *Anna* for $72,500 just a few months before, one might conclude that the *Anna* was increasing in value during the contemporaneous pendency of this matter. Accordingly, we hold against respondent with respect to his contention that the *Anna* will become greatly reduced in value if not sold.

*Can the "Anna" be kept "without great expense?"*

Respondent argues that, to date, $2,429.55 has been expended regarding the seizure and storage of the vessel *Anna*. Respondent points out that dry storage for the *Anna* is $700 per month and it will cost $800 per month to keep the *Anna* in the water. The $800 estimate is comprised of $300 for moorage, $300 for custodial fees, and $200 for insurance. Finally, respondent argues that if the value of

the *Anna* is $75,000, then the monthly cost until sale will represent about 1 percent of the value.

Petitioner counters that part of the $2,429.55 already incurred by respondent was unnecessary, i.e., the towing expense of $437.50. Further, petitioner argues that respondent's estimate of $800 is high because adequate moorage is available for $150 per month and $100,000 marine insurance policies are available for under $600 per year. Finally, petitioner argues that, even assuming that respondent's $800 per month cost estimate is correct, respondent has not shown that amount to be a "great expense" within the meaning of the statute and in relation to the value of the *Anna*. We agree with petitioner.

Although it is not entirely clear what the correct amount of monthly cost to keep the *Anna* in the water would be, we hold that 1 percent of the value per month is not a "great expense" within the context of this case.[4] Assuming the costs are 1 percent per month and that the value of the *Anna* does not appreciate or depreciate, it would take 8⅓ years to consume the *Anna*'s current value.

In view of the foregoing,

*An appropriate order will be entered staying the sale of the vessel "Anna".*

---

[4]By means of a telephone conference, the parties have agreed to present this case on the underlying merits of the tax deficiencies, if necessary, on the Court's regular Dec. 3, 1990, calendar at Seattle, Washington.