124 T.C. No. 14

UNITED STATES TAX COURT

MICHAEL A. ZAPARA AND GINA A. ZAPARA, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9480-02L.                    Filed May 17, 2005.

In a prior District Court criminal proceeding, Ps
pleaded guilty to various tax-related offenses with respect
to tax years 1993-95.  Ps signed a Form 4549-CG, Income Tax
Examination Changes, in which they waived the right to
contest their tax liability in Tax Court and consented to
the immediate assessment and collection of their 1993-95
taxes.  Subsequently, H's plea agreement was found to
contain erroneous calculations as to the amount of the
Government's tax loss; the District Court found that H had
received ineffective assistance of counsel in this regard
and reduced his sentence using the correct calculation.

In order to collect Ps' 1993-95 tax liabilities as
shown on the Form 4549-CG, as well as Ps' reported but
unpaid tax liabilities for tax years 1997 and 1998, R
made a jeopardy levy with respect to certain stock
accounts held on petitioners' behalf.  Ps requested an
Appeals Office hearing pursuant to sec. 6330(f), I.R.C.
During the Appeals Office case, Ps challenged their
underlying tax liabilities for 1993-95, alleging that

they had signed the Form 4549-CG under duress or coercion and that the Form 4549-CG overstated their true tax liability.  Pursuant to sec. 6335(f), I.R.C., Ps also requested R to sell the stock in the seized stock accounts and apply the proceeds to their outstanding tax liabilities.

R neither sold the stock in the seized accounts nor made a determination that selling the stock would not be in the best interests of the United States.  R sent Ps a notice of determination concluding that Ps were precluded from challenging their underlying 1993-95 tax liabilities and that the jeopardy levy would not be withdrawn.  Ps petitioned this Court to review R's determination.  Ps claim that the value of the seized stock accounts has declined significantly since they requested R to liquidate them.

1.  Held, Ps have not shown that they signed the Form 4549-CG under duress or coercion, or that it includes erroneous loss calculations; Ps may not contest their underlying tax liabilities for 1993-95.

2.  Held, further, R has complied with the notice requirements of sec. 6331(a) and (d), I.R.C.

3.  Held, further, Ps are entitled to a credit for the value of the seized stock accounts as of the date by which the stock should have been sold under sec. 6335(f), I.R.C.; i.e., 60 days from the date Ps requested R to sell the stock and apply the proceeds to their outstanding tax liabilities.

Michael A. Zapara and Gina A. Zapara, pro sese.

Lorraine Y. Wu, for respondent.

THORNTON, Judge:  Pursuant to section 6330(d), petitioners seek review of an Appeals Office determination sustaining a jeopardy levy.[1]

### FINDINGS OF FACT

The parties have stipulated some facts, which we incorporate herein.  When they filed their petition, petitioners resided in Kilauea, Hawaii.

Criminal Proceedings

On February 25, 1999, Mr. Zapara signed a plea agreement, pleading guilty to tax evasion and bank fraud.  In the plea agreement, Mr. Zapara admitted that he evaded his taxes for tax years 1993, 1994, and 1995, and that he should have reported $465,943.62 in income he received as a result of bank fraud and other fraudulent schemes.  Also, on February 25, 1999, Mrs. Zapara signed a plea agreement, pleading guilty to subscribing to a false tax return and admitting that she signed a tax return that omitted income derived from the fraudulent activities of Mr. Zapara.  Attorney Nicholas G. Spirtos (Mr. Spirtos) represented petitioners during their criminal prosecutions and in negotiating the plea agreements.  On February 26, 2001, a Federal District Court sentenced Mr. Zapara.  James D. Henderson (Mr. Henderson) represented Mr. Zapara in the sentencing phase of his criminal case.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended.

At some point after sentencing, Mr. Zapara filed a "Notice of Motion and Motion to Vacate, Set Aside, or Correct Defendant's Sentence".  In his motion, Mr. Zapara alleged that he was denied effective assistance of counsel, that his attorney, Mr. Spirtos, had an irreconcilable conflict between his own interests and Mr. Zapara's interests, and that the plea agreement erroneously computed the Government's tax loss for purposes of sentencing. In its opposition to Mr. Zapara's motion, the Government conceded that because of "a mathematical or typographical error in the plea agreement, the tax loss was mistakenly calculated as being over $200,000" and that the "correct tax loss is over $120,000".

On February 28, 2002, the District Court filed an order granting in part and denying in part Mr. Zapara's motion.  On the basis of the Government's concession, the District Court found that Mr. Spirtos provided ineffective assistance of counsel in negotiating a plea agreement containing a computational error and that Mr. Henderson provided ineffective assistance of counsel in failing to recognize the mistake and allowing Mr. Zapara to be sentenced using the improper calculation.  The District Court corrected Mr. Zapara's sentence using the proper calculation.

Income Tax Examination and Form 4549-CG

On February 29, 2000, petitioners signed a Form 4549-CG, Income Tax Examination Changes, for taxable years 1993, 1994, and 1995. The unreported income adjustments on the Form 4549-CG total $361,559 for 1993, $23,894 for 1994, and $80,489 for 1995.[2] The Form 4549-CG shows balances due, exclusive of interest and penalties, of $122,463 for 1993, $3,695 for 1994, and $17,312 for 1995. After adding section 6663 fraud penalties and interest, the Form 4549-CG shows balances due of $344,498 for 1993, $9,560 for 1994, and $40,657 for 1995.

Petitioners' 1997 and 1998 Income Tax Liabilities

On May 15, 2000, petitioners filed their 1997 and 1998 income tax returns showing taxes due. On May 15, 2000, on the basis of those returns, respondent made assessments of $30,744.60 for 1997 and $31,529.80 for 1998, as well as interest, penalties, and additions to tax.

Jeopardy Levy

On June 1, 2000, respondent provided petitioners with "Notice of Jeopardy Levy and Right of Appeal" for the following unpaid tax amounts:

---

[2] The adjustments for 1993 include (in addition to the $361,559 unreported income adjustments) a $14,100 adjustment for exemptions.

| Taxable Period | Tax | Penalty | Interest |
|---|---|---|---|
| 1993 | $122,463 | $91,847 | $157,408 |
| 1994 | 3,695 | 2,771 | 4,221 |
| 1995 | 17,312 | 12,984 | 15,085 |
| 1997 | 42,049 | 4,245 | 7,453 |
| 1998 | 38,264 | 2,167 | 4,060 |

On June 1, 2000, respondent issued Forms 668-A(c)(DO), Notice of Levy, to Travis Morgan Securities, Inc., with respect to certain nominee stock accounts held on petitioners' behalf. Respondent's collection division took the position that these stock accounts had a value of approximately $1 million--more than enough to pay off fully petitioners' then-outstanding tax liabilities of about $500,000.

By letter dated June 21, 2000, petitioners requested a section 6330 Appeals hearing with respect to the jeopardy levy. In November 2000, Appeals Officer Janice Rich was assigned to consider petitioners' request for an Appeals hearing. In the initial stages of the proceedings in the Appeals Office, petitioners were represented by Mr. Spirtos; however, on April 30, 2001, respondent received a Form 2848, Power of Attorney and Declaration of Representative, for Steven R. Mather (Mr. Mather). From that point on, Mr. Mather represented petitioners in the Appeals Office.

In their Appeals Office case, petitioners raised the following issues: (1) That they were not liable for the amounts of tax asserted in the Form 4549-CG because they signed that form

under duress; (2) that they believed the amounts asserted in the Form 4549-CG were too high because it was their belief that the amount of the liability in their criminal tax evasion proceeding was less than the amount asserted in the Form 4549-CG signed by petitioners; (3) that they wished to sell stock in the possession of a revenue officer and apply the proceeds to their outstanding tax liabilities; and (4) that they intended to submit an offer in compromise or installment agreement.  Petitioners did not submit an offer in compromise or installment agreement for consideration by the Appeals officer and did not raise any challenges to their underlying tax liabilities for 1997 and 1998.

With respect to the sale of stock, on August 23, 2001, Mr. Mather sent a fax to Appeals Officer Janice Rich asking her for a "letter to say okay to release stock for sale."  On September 7, 2001, the Appeals officer called Mr. Mather regarding the requested stock sale.  Respondent's case activity records reflect that the Appeals officer indicated to Mr. Mather:  "I would like him to put his request in writing and send to me w/cc to RO [revenue officer] since he is still working with RO.  He said he will do."  According to these same records, the Appeals officer also told Mr. Mather:  "I was going to talk to RO about stock sale-he was okay with me doing that-rep [Mr. Mather] already talked to him about too.  RO told him he wanted approval from me first."   On September 13, 2001, the Appeals officer informed Mr.

Mather that he needed to submit information regarding the stock, such as the fair market value, in writing and that a revenue officer would make a determination regarding the sale of the stock. Petitioners did not submit the required information regarding the fair market value of the stock. Respondent did not sell the stock accounts and made no determination regarding petitioners' request.

On May 8, 2002, the Appeals officer issued to petitioners a Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330 (the notice of determination). In the notice of determination, the Appeals Office determined that petitioners were precluded from challenging their underlying tax liabilities for 1993, 1994, and 1995, and that respondent's jeopardy levy would not be withdrawn.

OPINION

I. Introduction

If a person neglects or refuses to make payment of any assessed Federal tax liability within 10 days of notice and demand, the Secretary is authorized to collect the assessed tax by levy on the person's property. Sec. 6331(a). Section 6330(a) provides, however, that no levy may be made on any property or right to property of any person unless the Secretary has notified such person in writing of the right to a fair hearing before levy.

Under section 6330(f), if the Secretary has made a finding that the collection of tax is in jeopardy, the requirement of notice and opportunity for hearing before levy under section 6330 shall not apply.  Nonetheless, the taxpayer shall be given the opportunity for the hearing described in section 6330 within a reasonable period of time after the levy.  Sec. 6330(f) (flush language).  We have jurisdiction under section 6330(d) to review jeopardy levy determinations.  <u>Dorn v. Commissioner</u>, 119 T.C. 356 (2002).  Where the validity of the underlying tax liability is properly at issue, we review the matter de novo; otherwise, we review the Commissioner's determination for an abuse of discretion.  <u>Sego v. Commissioner</u>, 114 T.C. 604, 610 (2000).

In this proceeding, petitioners raise challenges to their underlying tax liabilities for 1993, 1994, and 1995, and the Appeals Office's determination not to withdraw respondent's jeopardy levy for 1993, 1994, 1995, 1997, and 1998.[3]

II.  <u>Underlying Tax Liabilities</u>

At an Appeals Office hearing, the taxpayer may raise "any relevant issue relating to the unpaid tax or the proposed levy".  Sec. 6330(c)(2)(A).  The taxpayer may challenge the existence or amount of the underlying tax liability for any tax period if the taxpayer received no statutory notice of deficiency for the tax

---

[3] Petitioners make no argument that sec. 7491(a) applies in this case and have not established that they satisfied the requirements of sec. 7491(a)(2).

liability or otherwise had no opportunity to dispute the tax liability.  Sec. 6330(c)(2)(B).

A.  Form 4549-CG

Petitioners signed a Form 4549-CG, Income Tax Examination Changes, waiving restrictions on assessment with respect to their underlying tax liabilities for 1993, 1994, and 1995.  We have recently held that for purposes of section 6330(c)(2)(B), a taxpayer who has signed a Form 4549-CG waiving his right to challenge the proposed assessments should be deemed to have had an opportunity to dispute his tax liabilities and is thereby precluded from challenging those tax liabilities.  Horn v. Commissioner, T.C. Memo. 2002-207; see Aquirre v. Commissioner, 117 T.C. 324, 327 (2001).  Petitioners argue, however, that they signed their Form 4549-CG under duress.  If a taxpayer signs a Form 4549-CG under duress or coercion, the Form 4549-CG waiver is invalid.  Shireman v. Commissioner, T.C. Memo. 2004-155.  This Court has defined duress as actions by one party which deprive another of his or her freedom of will to do or not to do a specific act.  Diescher v. Commissioner, 18 B.T.A. 353, 358 (1929); Price v. Commissioner, T.C. Memo. 1981-693, affd. without published opinion 742 F.2d 1460 (7th Cir. 1984).

1.  Duress or Coercion by Respondent

Petitioners allege that they signed the Form 4549-CG only as a result of respondent's continuous pattern of duress, coercion, and intimidation against them.  Petitioners' allegation is

unfounded and misplaced. It stems from the Government's efforts to prosecute them for admittedly criminal conduct and to collect taxes and penalties. No doubt, given the circumstances, these efforts were zealous and disadvantageous to petitioners; however, petitioners have presented no evidence that these efforts went beyond what the law prescribes and, indeed, requires. Insofar as the Government's actions leading up to petitioners' signing of the Form 4549-CG were authorized by law, those actions do not give rise to duress or coercion. Shireman v. Commissioner, supra; Ballard v. Commissioner, T.C. Memo. 1987-471, affd. 851 F.2d 359 (5th Cir. 1988).

On occasion, this Court has held that the Commissioner's threats to take otherwise lawful action against the taxpayer constituted duress or coercion. See Diescher v. Commissioner, supra (holding that the Commissioner's threat to impose fraud penalties if taxpayer did not sign waiver constituted duress); Robertson v. Commissioner, T.C. Memo. 1973-205 (holding that the taxpayers consented to extending the limitations period under the Commissioner's duress). Petitioners allege that respondent's agents (as well as their attorney) pressured them to sign the Form 4549-CG as a precondition to their plea agreement. Petitioners allege that they were informed the plea agreement would be voided if they did not sign the Form 4549-CG before their sentencing date.

Petitioners have provided no factual support for their allegations. The evidence indicates that petitioners were informed that their signing of the Form 4549-CG was a precondition to an offer in compromise, rather than a precondition to the acceptance of their plea agreement. Petitioners have not established any duress or coercion by respondent.

2. Duress or Coercion by Petitioners' Attorney

Petitioners allege that Mr. Spirtos was ineffective counsel and argue that the lack of effective counsel invalidates the Form 4549-CG. In support of this argument, petitioners rely on a transcript of a District Court hearing wherein the District Court judge expressed general concern regarding Mr. Spirtos's effectiveness as an attorney and his handling of Mr. Zapara's criminal case.

We are not persuaded that ineffectiveness of counsel constitutes duress or coercion or otherwise invalidates a Form 4549-CG. In any event, the District Court's conclusions do not establish that Mr. Spirtos was ineffective in representing petitioners with respect to their signing the Form 4549-CG. The District Court's order, filed February 28, 2002, concluded that Mr. Spirtos rendered ineffective assistance of counsel in negotiating a plea agreement that contained an erroneous loss calculation. The District Court's order granted petitioners relief to the "limited extent" of revising the loss calculation

and reducing the sentence. The District Court concluded that petitioners otherwise "suffered no prejudice" from Mr. Spirtos's representation of them. The District Court did not throw out the plea agreement or otherwise vacate Mr. Zapara's sentence. As explained in more detail infra, the erroneous loss calculation is not reflected in the Form 4549-CG. Accordingly, we are not persuaded that any ineffective assistance of counsel on Mr. Spirtos's part prejudiced petitioners, much less amounted to duress or coercion, with respect to their signing the Form 4549-CG.

Petitioners also allege that, at the time they signed the Form 4549-CG, Mr. Spirtos's "conduct was self serving, he had an irreconcilable conflict between his own interests and the interests of his client * * * as he was under investigation from the Internal Revenue [Service] and the United States Attorney's Office at the time he was representing the Petitioners". In support of this allegation, petitioners rely on the declaration of Mr. Mather, which is attached to Mr. Zapara's motion to vacate, set aside, or correct his sentence, filed in the District Court in September 2001. In that declaration, Mr. Mather declared: "Mr. Scharf [petitioners' attorney] asked [Mr. Spirtos and Mrs. Spirtos] if, during their dealings with the government on behalf of Mr. and Mrs. Zapara, there was an investigation by the same agent and prosecutor concerning Mr. and Mrs. Spirtos. Mrs. Spirtos agreed that there was." Petitioners also rely on

Mr. Zapara's declaration attached to that same motion. In his declaration, Mr. Zapara declares that following a June 2000 meeting with the U.S. Attorney's Office, special agents asked petitioners to leave and asked Mr. and Mrs. Spirtos to remain and that "Mr. and Mrs. Spirtos informed us that they were being investigated and the agents wanted to question them about that investigation."

We do not rely on Mr. Mather's and Mr. Zapara's declarations for the truth of the matters asserted therein. Petitioners provided no independent evidence to establish their allegations. Mr. Zapara did not testify, petitioners did not call Mrs. Spirtos as a witness, and although Mrs. Zapara testified, she did not testify regarding Mr. Spirtos's alleged conflict. In addition, even if we were to assume that the declarations are true and that Mr. Spirtos was under investigation by the Government, petitioners introduced no evidence as to how this purported circumstance influenced Mr. Spirtos's representation of petitioners, and prejudiced them, in their signing the Form 4549-CG. We also point out that the District Court, which presumably reviewed these declarations in issuing its February 28, 2002, order, found Mr. Zapara's arguments (other than his argument regarding the loss calculation) to be "without merit".

### 3. Conclusion

Petitioners have not shown that they signed the Form 4549-CG under duress or coercion. Consequently, petitioners are

precluded from challenging their underlying tax liabilities for 1993, 1994, and 1995.

      B.  <u>Does the Form 4549-CG Include Erroneous Loss Calculations</u>?

As just discussed, in the criminal proceedings in Federal District Court, Mr. Zapara challenged his sentence, arguing, among other things, that the tax loss to the Government was erroneously computed in his plea agreement. On the basis of this argument, the District Court granted, in part, Mr. Zapara's motion to vacate, set aside, or correct sentence and revised Mr. Zapara's sentence using the correct tax loss figure. Petitioners contend that their tax liabilities in the Form 4549-CG contain these same erroneous calculations.

We need not decide whether petitioners' signing the Form 4549-CG precludes them from arguing that the Form 4549-CG contains errors, because petitioners have failed to show that the Form 4549-CG contains the same erroneous calculations as Mr. Zapara's plea agreement. In calculating the Government's tax loss for 1993, 1994, and 1995, the plea agreement erroneously included in income 100 percent (instead of 20 percent) of a certain "Toya check" in 1994 and $250,000 (instead of $75,000) of a certain "Booz check" in 1995. Using these erroneous figures, the plea agreement computed the Government's tax loss as being more than $200,000, whereas the correct tax loss figure was $128,390.29. At trial, Revenue Agent Barry Johnson, who prepared

the Form 4549-CG, testified credibly, and without contradiction, that the figures in the Form 4549-CG were correct and did not contain the same errors as the plea agreement.[4]  Our own review of the Form 4549-CG also indicates that the correct amounts of the Toya and Booz checks were included in petitioners' income as reflected on that form.

C.  Taxable Years 1997 and 1998

Petitioners' unpaid tax liabilities for 1997 and 1998 arise from self-assessed amounts reported on their Federal income tax returns.  Petitioners would not have been precluded from challenging these liabilities under section 6330(c)(2)(B).  See Montgomery v. Commissioner, 122 T.C. 1 (2004).  Nonetheless, petitioners have raised no challenges to their unpaid tax liabilities for 1997 and 1998.

III. Notice and Demand

In their pretrial memorandum and at trial, petitioners argued that they did not receive proper notice and demand for payment as required under section 6331(a).  On brief, however, petitioners make no argument regarding respondent's compliance with the requirement of notice and demand in section 6331(a).  We

---

[4] On the Form 4549-CG, the total amount of tax due for 1993, 1994, and 1995 is shown to be $143,470, whereas in petitioners' criminal proceeding the Government indicated that the corrected tax loss was $128,390.29.  Revenue Agent Johnson explained that this difference is attributable to the Government's use of a flat 28-percent tax rate in criminal tax evasion cases.

conclude that petitioners have abandoned this argument.  See Nicklaus v. Commissioner, 117 T.C. 117, 120 n.4 (2001) (concluding that taxpayers abandoned arguments and contentions asserted prior to the filing of their brief where they failed to advance those arguments and contentions on brief).  Even if we had not concluded that petitioners have abandoned this argument, however, we would reject such an argument for the reasons described below.

As a general rule, if the Commissioner wishes to collect a tax liability by levy, he must provide 10 days' advance notice and demand to the person who owes the tax.  Sec. 6331(a).  If the Commissioner makes a finding that the collection of tax is in jeopardy, however, he may make notice and demand for immediate payment.  Id.  If the person who owes the tax then fails or refuses to pay it, the Commissioner may collect without regard to the usual 10-day notice and demand period.  Id.

Generally, notice and demand for payment of tax shall be left at the dwelling or usual place of business of the taxpayer, or shall be sent by mail to the taxpayer's last known address.  See sec. 6303(a).  Generally, the taxpayer's last known address is the address shown on the taxpayer's most recently filed return, absent clear and concise notice of a change of address.  Abeles v. Commissioner, 91 T.C. 1019, 1035 (1988).  The taxpayer bears the burden of proving that notice was not sent to his or

her last known address. See Yusko v. Commissioner, 89 T.C. 806, 808 (1987).

In connection with petitioners' request for an Appeals hearing, Appeals Officer Janice Rich prepared an Appeals case memo, which is in evidence pursuant to the parties' joint stipulation. According to the Appeals case memo, the Appeals officer verified that petitioners were sent proper notice and demand for payment of their 1993, 1994, and 1995, tax liabilities. Specifically, the Appeals officer verified that, on May 2, 2000, these notices were accepted by taxpayer's housekeeper at 25 South Clancy Lane, Rancho Mirage, California, which was petitioners' last known address on respondent's computer database.[5] The Appeals officer also verified that on the same date (May 2, 2000), these notices were also mailed via regular mail individually, and certified mail individually, to the same address.

Petitioners have not challenged this verification, except in these two respects: First, petitioners claim that on May 2, 2000, their legal residence was P.O. Box 1405, Rancho Mirage, California. Petitioners presented no evidence, however, that respondent was given notice of that address on or before May 2,

---

[5] The Appeals officer also verified that petitioners were given notice for their 1997 and 1998 tax years on May 15, 2000, the date their 1997 and 1998 Federal income tax returns were processed. Petitioners raised no challenge to that verification.

2000, or that it was their last known address. Second, petitioners contend that their housekeeper did not speak English, had no authority to accept any letters or paperwork for petitioners, and did not give any of the notices to petitioners. We need not linger long over this latter contention, however, for as previously discussed, the Appeals officer verified (and petitioners have not refuted) that the notices were also mailed to petitioners, by both regular and certified mail, on the same date. Petitioners have failed to refute the Appeals officer's verification that respondent made notice and demand for payment of petitioners' tax liabilities as required by section 6331(a).[6]

IV. Notice of Intent To Levy

On brief, petitioners argue that they were not given proper notice of intent to levy under section 6331(d). Section 6331(d)(1) and (2) provides that at least 30 days before taking levy action, the Commissioner must provide the taxpayer with a written notice of intent to levy. The notice requirement of section 6331(d), however, does not apply to a levy if the Commissioner has made a finding that collection of tax is in

---

[6] At trial, respondent introduced into evidence Forms 3552, Notice of Tax Due on Federal Tax Return, dated June 1, 2000 (the same date the jeopardy levy was made), that are addressed to P.O. Box 1405, Rancho Mirage, California 92270. Petitioners do not deny receiving these notices. Inasmuch as we have upheld the Appeals officer's verification that respondent made proper notice and demand on May 2, 2000, we need not and do not decide whether these Forms 3552 satisfied the sec. 6331(a) notice and demand requirements for the jeopardy levy.

jeopardy.  Sec. 6331(d)(3).  Because respondent made a jeopardy finding in this case, we conclude that respondent has complied with section 6331(d) and that the 30-day period described in that section is inapplicable.

## V.  Failure To Sell Stock Accounts

Respondent served a notice of levy, dated June 1, 2000, on Travis Morgan Securities, Inc., which held a number of stock accounts that Mr. Zapara owned.  Petitioners allege that, at the time of the levy, the stock accounts had a value of approximately $1 million.  Petitioners contend that they requested respondent to liquidate the stock accounts, but that respondent failed to honor their request.  Petitioners claim the stocks have since suffered a significant decline in value.  Petitioners argue that they should be given full credit of $1 million for the stock accounts.

### A.  Seizure and Sale of Property

The Code defines the term "levy" to include seizure by any means.  Sec. 6331(b).  Levy may be made by serving a notice of levy on any person in possession of, or obligated with respect to, property or rights to property subject to levy, including receivables, bank accounts, evidences of debt, securities, and salaries, wages, commissions, or other compensation.  Sec. 301.6331-1(a)(1), Proced. & Admin. Regs.  A levy is effective

upon service of the notice of levy.  Resolution Trust Corporation v. Gill, 960 F.2d 336, 340 (3d Cir. 1992).[7]

Service of a notice of levy constitutes a seizure of property, see sec. 6331(b) (equating levy and seizure); Phelps v. United States, 421 U.S. 330, 337 (1975) (stating that "notice of levy and demand are equivalent to seizure"); however, it does not transfer ownership of property to the Internal Revenue Service (IRS).  "Ownership of the property is transferred only when the property is sold to a bona fide purchaser at a tax sale."  United States v. Whiting Pools, Inc., 462 U.S. 198, 211 (1983).  Instead, a notice of levy gives the Commissioner the right to all property levied upon and creates a custodial relationship between the third party and the IRS so that the property comes into the constructive possession of the Government.  United States v. Natl. Bank of Commerce, 472 U.S. 713, 720 (1985).  For these

---

[7] Under sec. 6332(a), any person in possession of (or obligated with respect to) property or rights to property subject to levy upon which a levy has been made shall, upon demand of the Secretary, surrender such property or rights (or discharge such obligation) to the Secretary.  If the third party honors the levy, he or she is discharged from any obligation or liability to the delinquent taxpayer (or any other person) with respect to such property or rights to property arising from such surrender or payment.  Sec. 6332(e).  If, on the other hand, the third party refuses to honor a levy, he or she becomes personally liable to the Government.  Sec. 6332(d)(1) and (2); see United States v. Natl. Bank of Commerce, 472 U.S. 713, 721 (1985).

reasons, a taxpayer generally is not entitled to a credit for seized property until it is sold.  See sec. 6342.[8]

B.  Dominion and Control of Seized Property

Some courts have held that a taxpayer is entitled to credit for seized property where the Commissioner has exercised dominion and control over the property to the taxpayer's exclusion.  See United States v. Barlow's, Inc., 767 F.2d 1098 (4th Cir. 1985), affg. 53 Bankr. 986 (E.D. Va. 1984); United States v. Pittman, 449 F.2d 623 (7th Cir. 1971).  Petitioners rely upon these cases in arguing that they are entitled to a credit for the value of their stock accounts.

In each of the cited cases, the Commissioner went well beyond mere service of a notice of levy on the property, exercising powers over the property essentially consistent with ownership.  For example, in United States v. Barlow's, Inc., supra, the Commissioner served a notice of levy on a third-party debtor with respect to an account receivable that the taxpayer owned.  The Commissioner did not sell the account receivable but

_____

[8] Sec. 6342(a) provides that any money realized by proceedings under the seizure of property provisions (whether realized by seizure, by surrender, or by sale of seized property), or by sale of property redeemed by the United States shall be applied:  (1) First, against the expenses of the proceedings; (2) then against any specific tax liability on the seized property; and (3) then against the liability in respect of which the levy was made or the sale was conducted.  The Commissioner must credit or refund to the taxpayer any surplus proceeds.  Sec. 6342(b).

instead entered into an installment payment agreement with the debtor. The third-party debtor made some payments pursuant to this agreement but ultimately defaulted on it. The Commissioner failed to take any further action to collect on the account receivable or the installment payment agreement.

In United States v. Pittman, supra, the Commissioner served notice of levy on a third-party nominee that held legal title to the taxpayer's real property. The nominee thereafter quitclaimed this property to the Commissioner, who recorded the deed, maintained insurance on the property, and rented the property.

These cases are factually distinguishable from the instant case, and petitioners' reliance upon them is misplaced. Petitioners have failed to allege facts that would support a finding that respondent exercised dominion and control over their seized property. Petitioners have alleged no action by respondent with respect to their stock accounts, other than levying upon them. Petitioners' lack of control over the accounts and their inability to sell the stocks does not establish conduct on respondent's part analogous to the Commissioner's conduct in United States v. Barlow's, Inc., supra, or United States v. Pittman, supra. Cf. Murphy v. United States, 45 F.3d 520 (1st Cir. 1995); Enos v. Commissioner, 123 T.C. 284, 298 (2004). Petitioners have failed to show that respondent exercised dominion and control over the stock accounts.

C.  Duty To Sell Seized Property

Petitioners argue that respondent had an obligation under the seizure and sale provisions of the Code to sell the stock in the nominee accounts.  Petitioners contend that respondent's failure to sell the stock entitles them to a credit equal to the value of the stock at the time it should have been sold.

In any case in which the Commissioner may levy upon property or rights to property, he may seize and sell such property or rights to property (whether real or personal, tangible or intangible).  Sec. 6331(b).  As soon as practicable after seizure of property, the Commissioner shall give notice of seizure and sale to the owner of the property (or, in the case of personal property, the possessor thereof), and shall give public notice of the time, place, manner and conditions of sale.  Sec. 6335(a) and (b).  The time of sale shall not be less than 10 days nor more than 40 days from the time of giving public notice of sale.  Sec. 6335(d).

Section 6335(b) does not say exactly how long the Commissioner has between seizing property and publishing notice of sale; it just says "as soon as practicable".  See Anderson v. United States, 44 F.3d 795, 800 (9th Cir. 1995).  Nonetheless, if the owner believes that the Commissioner is taking longer than necessary to sell seized property, the owner has the right to request sale under section 6335(f).  Id.  "The request provision

of * * * [section 6335(f)] gives the owner a remedy if the IRS has seized the property, a long time has passed, yet the IRS has not given notice of when the sale will be held." Id. In this sense, section 6335(f) effectively "regulates the time period between seizure and sale". Id. Because section 6335(f) provides an adequate remedy for any delays in selling property and in the absence of a definite statutory time period for providing notice of public sale, we decline to impose on respondent a general duty to timely sell seized property pursuant to section 6335(b).[9] Cf. Cash v. United States, 961 F.2d 562, 567 (5th Cir. 1992) (rejecting taxpayers' contention that section 6335(b) requires the Commissioner to sell all property it seizes: "We read that section as merely setting forth the procedures the Service must follow when it does sell such property.").

D. Request To Sell Seized Property Pursuant to Section 6335(f)

Under section 6335(f), the owner of any property seized by levy may request the Commissioner to sell the seized property within 60 days after the request (or within any longer period

---

[9] We note that sec. 6336 authorizes the Commissioner to sell any seized property that is liable to perish or become greatly reduced in price or value by keeping. Except in hindsight, petitioners do not allege facts that might have authorized an immediate sale of their stock under sec. 6336. See Galusha v. Commissioner, 95 T.C. 218 (1990); Williams v. Commissioner, 92 T.C. 920 (1989). We do not decide whether the Commissioner has a general duty to sell property of the type described in that section.

that the owner specifies). The Commissioner must comply with the request unless the Commissioner determines (and notifies the owner within such period) that compliance would not be in the best interests of the United States. Sec. 6335(f).

The applicable regulation requires that any request under section 6335(f) be made in writing to the group manager of the revenue officer whose signature is on the notice of levy. Sec. 301.6335-1(d)(2)(i), Proced. & Admin. Regs.[10] The regulation provides that the request to sell seized property should include the following information:

> (A) The name, current address, current home and work telephone numbers and any convenient times to be contacted, and taxpayer identification number of the owner making the request;
>
> (B) A description of the seized property that is the subject of the request;
>
> (C) A copy of the notice of seizure, if available;
>
> (D) The period within which the owner is requesting that the property be sold; and
>
> (E) The signature of the owner or duly authorized representative. * * * [Sec. 301.6335-1(d)(2)(ii), Proced. & Admin. Regs.]

The group manager must respond in writing to a request for sale of seized property as soon as practicable after receipt of such request and in no event later than 60 days after receipt of the

---

[10] If the owner does not know the group manager's name or address, the owner may send the request to the revenue officer, marked for the attention of his or her group manager. Sec. 301.6335-1(d)(2)(i), Proced. & Admin. Regs.

request (or, if later, the date specified by the owner for the sale). Sec. 301.6335-1(d)(3), Proced. & Admin. Regs.

Petitioners contend that their counsel requested respondent to sell the stocks in the seized accounts. On the basis of all the evidence, we believe that such a request was made. Indeed, the Appeals officer's case memo states: "The request to sell the stock was made during consideration of this case." The question is when was the request made. The evidence is skimpy.

Petitioners rely upon a letter to Mr. Spirtos from Revenue Officer F. Stevens, dated November 2, 2000. This letter states: "The funds under levy at Travis Morgan Securities, Inc. have not been liquidated to date because of your request for a Collection Due Process hearing, otherwise the funds would have been forwarded to the IRS within 45 days of the date the levy was served." On the basis of this letter, petitioners claim that they must have made a request before November 2, 2000. In the absence of additional evidence, however, we cannot infer that this statement was made in response to any request from petitioners to sell their stock.[11]

The Appeals officer's case activity record contains this entry, dated March 20, 2001: "TC [telephone call] from manager of RO [Revenue Officer] group-wanted to know if we had resolved

---

[11] This letter appears to have been made in response to a payment plan proposal from petitioners.

case since he was worried about not getting money under the levy issued. Told him he could not do anything until we resolved cdp [collection due process] case." There is no indication, however, that the group manager's concern arose from any request by petitioners to sell the stock; instead, this entry appears to reflect an internal deliberation.

Another entry in the Appeals officer's case activity record indicates that on August 23, 2001, Mr. Mather sent a fax to the Appeals officer "asking me for [a] letter to say okay to release stock for sale." The Appeals officer treated this request as a request to sell the seized stock accounts. Although the request is directed to the Appeals officer, rather than the revenue officer group manager, it is clear from the case activity record that the Appeals officer assumed effective authority over the disposition of the seized stock accounts as early as March 20, 2001. Under the circumstances of this case, we treat the August 23, 2001, fax from Mr. Mather as a request for sale of the seized stock pursuant to section 6335(f).[12]

---

[12] The parties did not stipulate the complete administrative record or offer into evidence the Aug. 23, 2001, fax from Mr. Mather. Consequently, we are unable to determine whether the fax contained all the information specified in sec. 301.6335-1(d)(2)(ii), Proced. & Admin. Regs., and whether it was signed by petitioners or their duly authorized representative. Considering the Appeals officer's subsequent response, we believe that the fax was sufficient for purposes of sec. 6335(f).

Under section 6335(f), after petitioners' request, respondent had 60 days to sell the stock accounts or to make a determination that a sale would not be in the best interests of the United States.  Respondent did not sell the stock accounts and made no such determination.  Instead, the Appeals officer took the position that petitioners first had to establish the fair market value of the stocks in the accounts.  Respondent cites no authority for conditioning sale on submission of this information.  Neither section 6335(f) nor the regulation requires the taxpayer to submit information regarding the fair market value of the seized property.[13]  Instead, section 6335(f) is clear that upon request, respondent must sell the seized property or make a determination why a sale is not in the best interests of the United States.

E.    Did Section 6330(e)(1) Preclude Respondent From Selling the Stock?

Respondent argues that under section 6330(e)(1), he was precluded from taking any action to collect pursuant to the levy, including selling the stock.

---

[13] Cf. sec. 6343(a)(1) (authorizing the Commissioner to release a levy under certain specified conditions, including where the fair market value of the property exceeds the taxpayer's liability and release of the levy on a part of the property could be made without hindering the collection of the liability); sec. 301.6343-1(b)(5), Example, Proced. & Admin. Regs. (providing for release of seized property where taxpayer establishes that fair market value exceeds tax liability).  There is no indication that Mr. Mather's Aug. 23, 2001, request was treated as a request for release of levy.

Section 6330(e)(1) provides in relevant part: "if a hearing is requested under * * * [section 6330(a)(3)(B)], the levy actions which are the subject of the requested hearing * * * shall be suspended for the period during which such hearing, and appeals therein, are pending." In the instant case, however, the levy action that is the subject of the section 6330 hearing had already occurred--under section 6331(a), respondent had made a finding that the collection of tax was in jeopardy and had levied on the stock accounts. Under section 6330(f)(1), if the Commissioner has made a finding that the collection of tax is in jeopardy, section 6330 shall not apply, except that the taxpayer shall be given the opportunity for a section 6330 hearing within a reasonable period of time after the levy. By reason of section 6330(f)(1), section 6330(e)(1) did not suspend the levy action that had already occurred and did not otherwise preclude respondent from selling the stock under section 6335.[14]

F.  Did the Internal Revenue Manual Preclude Respondent From Selling the Stock?

Respondent also argues that a sale of the seized stock accounts would have been improper under Internal Revenue Manual,

---

[14] On Jan. 18, 2002, the Secretary issued final regulations under sec. 6330, which are consonant with our reading of sec. 6330(e)(1). The applicable regulation asks: "What, if any, enforcement actions can the IRS take during the suspension period?" and answers: "the provisions in section 6330 do not apply when the IRS * * * determines that collection of the tax is in jeopardy." Sec. 301.6330-1(g)(2), Q&A-G3, Proced. & Admin. Regs.

sec. 5.10.4.1.1(2), which provides that the sale of seized property will generally be suspended during the administrative review process provided in section 7429.

Within 5 days after a jeopardy assessment is made under section 6861 or a jeopardy levy is made under section 6331(a), the Commissioner must provide the taxpayer a written statement of the information upon which the Commissioner relied in making the assessment or levy. Sec. 7429(a)(1)(B). Within 30 days after the taxpayer is furnished this written statement, or within 30 days after the last day of the period within which such statement is required to be furnished, the taxpayer may request the Commissioner to review the action taken. Sec. 7429(a)(2). After a request for review is made, the Commissioner must make a determination whether the jeopardy assessment or jeopardy levy is reasonable under the circumstances and whether the amount assessed is appropriate. Sec. 7429(a)(3).

On June 1, 2000, respondent issued to petitioners a notice of jeopardy levy and right of appeal under section 7429(a)(1). Petitioners then had 30 days within which to make a request for administrative review under section 7429(a)(2). They made no such request. Instead, petitioners submitted a Form 12153, Request for a Collection Due Process Hearing, under section 6330. Under these circumstances, a sale of the seized stock accounts was stayed by section 6863(c) only for the 30-day period that

petitioners could have requested administrative review under section 7429; i.e., until 30 days after June 1, 2000. Consequently, the Internal Revenue Manual section that respondent points to does not preclude respondent's sale of the stock accounts under section 6335(f).

G. Conclusion

On August 23, 2001, petitioners requested that respondent sell their stock and apply the proceeds to their outstanding tax liabilities. Respondent neither sold the stock nor made a determination that sale of the stock would not be in the best interests of the United States. We hold that petitioners are entitled to a credit for the value of the stock accounts as of the date by which the stocks should have been sold under section 6335(f); i.e., 60 days from August 23, 2001.[15] We also hold that respondent cannot claim any interest or accrue penalties on this credited amount after such date. See United States v. Barlows, Inc., 53 Bankr. 986 (E.D. Va. 1984). Under the circumstances, we believe it appropriate to remand this case to the Appeals Office for purposes of establishing the value of the stock accounts as of 60 days after August 23, 2001, and determining whether petitioners' tax liabilities for 1993, 1994, 1995, 1997, and 1998

---

[15] If, however, the value of the stock presently exceeds its value as of 60 days from Aug. 23, 2001, then respondent shall sell the stock and give petitioners appropriate credit.

remain unpaid, after crediting their accounts in accordance with this Opinion.

VI.   Whether the Appeals Officer Abused Her Discretion

    A.   Installment Agreement

At some point before Appeals Officer Janice Rich was assigned to petitioners' section 6330 case, petitioners proposed to pay $4,000 each month or $12,000 each quarter towards their 1997 and 1998 unpaid income tax liabilities.  In a letter dated November 2, 2000, Revenue Officer F. Stevens informed petitioners that respondent could not accept their proposal, partly because they were not current in filing Federal tax returns.

Petitioners argue that respondent's failure to accept their payment proposal was an abuse of discretion.  Petitioners allege that respondent's own actions precluded petitioners from filing returns in subsequent tax years.  Petitioners fail to explain, however, how respondent's actions precluded them from filing tax returns.  On the record before us, we find petitioners' allegation implausible.  In any event, respondent cited numerous reasons for rejecting petitioners' payment proposal, including their ability to make full or significant payment of all taxes due, their failure to submit collection information statements, and their failure to include all outstanding tax years.  Finally, there is no indication in the record that petitioners proposed their payment plan in the Appeals hearing.  Generally, this Court

does not consider issues or collection alternatives that are not raised in the Appeals hearing. Magana v. Commissioner, 118 T.C. 488, 493 (2002).

B. Offer in Compromise

At some point during the Appeals hearing, Mr. Mather indicated that petitioners intended to submit an offer in compromise. Nevertheless, petitioners failed to submit an offer in compromise. It appears that petitioners were not in full tax compliance at the time of the Appeals hearing because they had not filed their 1999 or 2000 Federal income tax return.

C. Other Challenges

Petitioners raise no spousal defenses, other collection alternatives, or other challenges to the jeopardy levy. Those issues are deemed conceded. See Rule 331(b)(4).

VII. Conclusion

Under section 6330(c)(2)(B), petitioners are precluded from challenging their underlying tax liabilities for 1993, 1994, and 1995. Petitioners raised no challenges to their underlying tax liabilities for 1997 and 1998 and, therefore, have conceded those issues. We remand this case to Appeals for purposes of

determining the value of the seized stock accounts as of the date which is 60 days after August 23, 2001.

<u>An appropriate order will be issued</u>.