T.C. Memo. 2011-140

UNITED STATES TAX COURT

MARK L. ROSENBLOOM, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8055-05L.                    Filed June 21, 2011.

<u>Jonathan P. Decatorsmith</u>[1] and <u>Alan F. Segal</u>, for petitioner.

<u>Mark J. Miller</u> and <u>James E. Schacht</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  In the summer of 1997 an IRS agent visited the office of a down-on-his-luck Chicago lawyer named Mark Rosenbloom.  Rosenbloom knew he owed back taxes--he had signed

---

[1] The Court acknowledges the outstanding *pro bono* effort of Mr. Decatorsmith and the Chicago-Kent College of Law Low-Income Taxpayer Clinic in this case.

installment agreements with the IRS in 1988 and 1993.  But his severe personal problems had caused him to delay sending in updated financial information and to miss a couple months' payments.  The agent squeezed hard, threatening to shut down Rosenbloom's office and put him out of business unless he consented to waive the statute of limitations until 2009 for overdue taxes dating back to 1981.  A month later, the agent returned to try to seize Rosenbloom's office furniture, and a few weeks after that tried to seal the elevator to Rosenbloom's office.

In 1998 Congress put an end to such aggressive collection tactics.[2]  The Commissioner announced that he would no longer rely on long-term waivers of the statute of limitations obtained (some might say coerced) while an installment agreement was in effect.  He also promised to cancel any such waivers that he had already obtained and refund or credit any payments that he had received.  The question in this case is whether Rosenbloom had an installment agreement in place when he signed that waiver of the statute of limitations back in 1997.  Rosenbloom and the Commissioner agree that the IRS had sent him a notice of default before getting the waiver.  The Commissioner argues that this means there was no longer a valid installment agreement.

---

[2] See the Internal Revenue Service Restructuring and Reform Act of 1998 (RRA 1998), Pub. L. 105-206, secs. 3401-68, 112 Stat. 746-770.

Rosenbloom argues that the notice of default wasn't by itself enough to terminate his installment agreement. Both parties agree that if an installment agreement was in effect when the Commissioner persuaded Rosenbloom to sign the waiver, the Commissioner may no longer collect.

FINDINGS OF FACT

Rosenbloom practiced law in Chicago for more than two decades and recognizes now that he was an alcoholic for most of that time, especially after 1980 when his stepson died from a long and painful illness. He nevertheless managed for a while to make a good living from his practice, where he did a little of everything from real-estate closings to criminal defense to tax. By the late '90s he had even become a bit of a rainmaker, but as his drinking grew worse he started to rely more heavily on several of his employees to do most of the work. Leaning on them, he was able to try, and partly win, a case in our Court as late as 1996.

Throughout much of this time, Rosenbloom was haunted by tax trouble. Many, many years ago, he had incurred an enormous tax debt--$1,748,248.37 in unpaid income tax, interest, and penalties from 1977-87 plus two quarters of trust-fund-recovery penalties[3]

---

[3] Taxes that employers withhold from their employees' wages are known as "trust fund taxes" because they are held by the employer essentially in trust for the United States under section 7501(a). Slodov v. United States, 436 U.S. 238, 243 (1978). The
(continued...)

from 1984 which he has never been able to pay.[4]  Rosenbloom

signed two installment agreements to deal with this problem:  the

first in 1988, which covered tax debts from 1977-79 and 1982-84;

and the second in 1993 which increased his monthly payment and

added his debts for tax years 1980-81 and 1985-87.  It's the

second agreement that concerns us here:  It called on him to pay

$406 per month to shave down his debt.  One of the important

terms of these agreements was Rosenbloom's promise to provide

updated financial information whenever the IRS asked for it.

Rosenbloom knew he had a good deal.  And the IRS's agreement to

accept payments so small relative to the total tax debt would get

even better for him over time, as the statute of limitations for

collecting each year's debt expired.[5]  Rosenbloom nevertheless

---

[3](...continued)
Commissioner may collect unpaid employment taxes from a
"responsible person" within the company; i.e., someone who was
required to pay over the tax.  The money that's assessed and
collected this way is called trust-fund-recovery penalties.  Sec.
6672.  (Unless otherwise indicated, references to sections in
this opinion are to the Internal Revenue Code, and all references
to Rules are to the Tax Court's Rules of Practice and Procedure.)

[4] Rosenbloom testified that he vastly overreported his
income some years--because "he was in a fog" before he became
sober.  Far too much time has passed to challenge any of these
liabilities, of course, but this part of his story does seem to
be borne out.  Account transcripts for some of the years show
exceptionally high adjusted gross income nearly equal to taxable
income, an unusual result for high-income taxpayers who typically
have personal deductions and exemptions in excess of those
Rosenbloom seems to have claimed.

[5] Where the assessment of Federal income tax is made within
(continued...)

acquiesced when an agent visited him in 1996 and got him to extend until the end of 2006 the statute of limitations for tax years 1977-79 and 1982-83. No one disputes that the installment agreement covered these years and was in effect when Rosenbloom signed this waiver. The Commissioner long ago revoked this waiver and stopped trying to collect these taxes.

This case focuses on 1997. It was a terrible time for Rosenbloom: Drinking led to his divorce that year, and he credibly testified that a brief reconciliation with his wife ended when his tax troubles erupted with the appearance in his life of Revenue Officer H. (as we'll call him, since he was not present at trial) in July. But the trend had been downhill for some time: He was losing clients, referrals were drying up, and he had been hit by several malpractice cases. To add to his woes, he received a Letter 1064 (DO) (or "Defaulted Installment

---

⁵(...continued)
the prescribed time under the Code (i.e., section 6501), the IRS in general has ten years to collect the assessed tax by levy. Sec. 6502. See also sec. 6503 (tolling of the statute of limitations under secs. 6501 and 6502); Jordan v. Commissioner, 134 T.C. 1, 7 n.5 (2010) (discussing the 1990 change to the statute of limitations under sec. 6502). The government, however, cannot levy on property for a debt covered by an installment agreement that is still in effect. E.g., sec. 301.6159-1(d), Proced. & Admin. Regs., 59 Fed. Reg. 66192, 66193 (as in effect Dec. 23, 1994); sec. 6331(k). Because the statute of limitations continues to run while a taxpayer is making payments under the agreement, once the time for levying has run out for a particular year, he is off the hook for that year's tax liability.

Agreement - Notice of Intent to Levy") dated May 5.  The letter threatened to cancel the installment agreement if he didn't provide updated financial information within 30 days.  Rosenbloom panicked, misconstrued the letter more as a notice that his giant tax debt was crashing back on him than a warning that it might if he didn't update his financial information, and stopped making his installment payments.

About a week after Rosenbloom got the letter, he was referred to an attorney, Alan Segal.  Segal called Revenue Officer H. and asked for a very brief extension to get him the updated financial information.  Segal said he needed more time because he had three trials on our Court's trial calendar in Chicago for the week that the information was due.[6]  Review Officer H. extended the deadline to provide the updated financial information,[7] and it was sent to him on June 19, 1997.  Segal's

---

[6] We found Segal to be an entirely credible witness, but checked our records on this minor point and found they corroborated his testimony.  See Drnovsek v. Commissioner, docket No. 14712-96 (hearing held June 2, 1997; stipulated decision entered July 9, 1997); Karnatz v. Commissioner, docket Nos. 15296-96 and 23667-96 (set for trial June 2, 1997; stipulated decision entered June 18, 1997); Weiner v. Commissioner, docket No. 15229-96 (set for trial June 2, 1997; stipulated decision entered June 18, 1997).

[7] The Commissioner objected to Segal's testimony (on which we largely base this finding) as hearsay.  On reflection, we regard it as evidence of a verbal act, or proof of an act of independent legal significance--here the agreement between H. and Segal to extend the 30-day period to provide updated financial information.  See 2 McCormick on Evidence, sec. 249 (6th ed. 2000
(continued...)

June 19 letter obliquely refers to the oral agreement to extend the 30-day deadline:  "[e]nclosed *as promised*, are the [financial information forms]."  (Emphasis added.)  Segal also credibly testified that he always followed up on his promises to revenue officers to comply with deadlines,[8] because "when you're dealing with a Revenue Officer, the only thing you have primarily is your credibility."  It's worth noting that other than objecting to Segal's testimony, the Commissioner provided no evidence, not even a cross-examination of Segal, to show that H. did not extend the 30-day deadline.  Having found Segal credible, we find that H. did extend the deadline for Rosenbloom to provide updated financial information.

Rosenbloom by then had missed a couple of his $406 monthly payments.  Officer H. did not send another letter, but instead

---

[7](...continued)
& supp. 2009); United States v. Montana, 199 F.3d 947, 950 (7th Cir. 1999) (treating "performative utterances", illustrated by promise, offer, or demand, as nonhearsay because they do not make any truth claims); United States v. Feldman, 825 F.2d 124 (7th Cir. 1987) (testimony of investors as to statements by salesmen admissible to show existence of fraudulent scheme).

[8] The Commissioner often extends nonstatutory deadlines, so there is nothing extraordinary about Segal's explanation.  See, e.g., Dinino v. Commissioner, T.C. Memo. 2009-284 (policy of Office of Appeals to consider financial information submitted past the deadline, and up until a notice of determination is issued); Judge v. Commissioner, T.C. Memo. 2009-135 (settlement officer abused his discretion in denying taxpayer a brief extension to correct his financial information); Mills v. Commissioner, T.C. Memo. 2004-164 (revenue officer grants deadline extension to submit financial information for an offer in compromise).

showed up at Rosenbloom's office on July 29, 1997.  By this time
H. had Segal's name on file as being Rosenbloom's attorney and so
should have contacted Segal instead.  See sec. 601.506(b),
Statement of Procedural Rules.[9]  Rosenbloom, though inebriated at
the time, still had enough wit to ask to speak to his lawyer.
H., however, told him that the IRS would "close him down" and
"put him out of business" if he didn't extend the statute.
Rosenbloom called Segal.  We believe Segal's testimony that
Rosenbloom's words were slurred.  We also believe Segal when he
said that he told Rosenbloom to just sign the waiver that H.
presented.  This second waiver--giving the IRS until January 2,
2009, to collect Rosenbloom's 1981, and 1985-87 tax debts--is the
waiver on which this case turns.[10]

Rosenbloom's signature on the waiver form isn't the end of
this part of the story.  Sometime in August 1997, Rosenbloom
again called Segal in a panic because H. had again visited his
office, this time to try to seize the furniture.  (He also levied
on Rosenbloom's bank account that month.)  Segal took Rosenbloom

---

[9] In the RRA 1998 Congress added section 6304 to the Code,
prohibiting the IRS from communicating directly with a taxpayer
known to be represented by an attorney.  See Pub. L. 105-206,
sec. 3566(a), 112 stat. 768.

[10] As a result of RRA 1998, sec. 3461(a), 112 Stat. 764,
waivers executed after 1999 are invalid if not agreed to at the
time the installment agreement is entered into.  See sec. 6502.
But because Rosenbloom's waiver was given in 1997, that
limitation does not apply.  See Joy v. Commissioner, T.C. Memo.
2008-197.

to meet with H. in late August or early September to try to work things out. They gave him a check for the four missed installment payments and one for September (which wasn't yet due). Rosenbloom resumed his payments for October, November, and December of 1997. Segal also sent in a check for $3,412.50--150 percent of the supposed forced-sale value of the office furniture (which he noted was generous given the state of the furniture) to forestall a levy that would have shut down what was left of Rosenbloom's practice.

H. nevertheless continued to seek a writ of entry to seize the furniture. And on the morning of September 30, 1997, Rosenbloom got a call from his office building's landlord telling him that someone from the IRS was trying to get permission to seal off his elevator. Believing that H. seemed more interested in retribution than collection (the office furniture he was trying to seize had already been preredeemed), Segal filed an application for Taxpayer Assistance (on the appropriately named Form 911) with the IRS Problem Resolution Office in Chicago.

This form requires a description of the hardship that will occur if the Office doesn't intervene. Segal described Rosenbloom's history of alcoholism, his recent breakdown and entry into an eight-week outpatient program, and even his trichotillomania (a compulsive disorder whose victims pull out their hair). Segal appealed to the Commissioner's reason:

Rosenbloom had already more than made up the missed payments, as well as tendered a check for more than the forced-sale value of the office furniture.  Rosenbloom was trying to recover from alcoholism, Segal wrote, and trying simultaneously to settle several malpractice suits.  If the Commissioner "closed him down," the debt would likely become completely uncollectible.  The IRS Problem Resolution Office intervened and stopped the seizure.

But Rosenbloom was getting worse.  In November 1997 he was hospitalized at the Mayo Clinic, which recommended that he detox at the Hazelden Addiction Treatment Center.  Segal oversaw Rosenbloom's purchase of money orders for the November and December installment payments, but then things completely fell apart.  Rosenbloom ended up checking into more than six rehabilitation centers in the next few years.  While in treatment, Rosenbloom abandoned his law practice and stopped making installment payments.  The Commissioner moved the tax debts into currently-not-collectible status.

Cases like Rosenbloom's led to the Internal Revenue Service Restructuring and Reform Act of 1998 (RRA 1998), Pub. L. 105-206, 112 Stat. 685, which created the system of pre-levy hearing and judicial review that we have today.  But by then many abusive IRS policies and procedures had come to light.  The Commissioner had learned about a particularly bad one:  If there was an

installment agreement in which the tax liability would not be paid off before the expiration of the statute of limitations, some IRS Service Centers would terminate or default the installment agreement (or threaten to do so) if the taxpayer didn't agree to extend the statute.[11]

This was a problem--no Code section, regulation, or Internal Revenue Manual (IRM) provision allows the IRS to terminate an installment agreement (and then presumably proceed with a levy) solely because the taxpayer refused to extend the collection statute. See generally sec. 6159. Therefore the IRS was exposed to potential civil liability, as well as negative press. See sec. 7433; Service Center Advice 1998-003 (Feb. 17, 1998) (discussing the problem). Statute-of-limitations waivers that the IRS procured this way were also possibly invalid as a product of duress, or otherwise unenforceable on equitable grounds.[12]

It came as no surprise, then, when on June 5, 1998, the IRS publicly apologized and said that it had implemented a recovery

---

[11] In the RRA 1998, secs. 3401, 3433, 3461, and 3467, 112 Stat. 750, 759-60, 764, 769-70, Congress amended sections 6159, 6331, 6502, 7443, etc., to make sure that the IRS stopped these offensive practices, as well as some others.

[12] See, e.g., Fredericks v. Commissioner, 126 F.3d 433 (3d Cir. 1997) (equitable estoppel overcomes waiver of statute), revg. T.C. Memo. 1996-222; Zapara v. Commissioner, 124 T.C. 223, 228-29 (2005); Shireman v. Commissioner, T.C. Memo. 2004-155 (waiver signed under duress invalid, but threats to take legally authorized action if taxpayer doesn't sign generally not duress); Robertson v. Commissioner, T.C. Memo. 1973-205 (taxpayer's consent to extend the statute under duress).

program to provide relief to taxpayers who were harmed by the improper terminations of installment agreements or improper requests for a waiver of the statute of limitations.  See IRS News Release IR-98-44 (June 5, 1998).  This is what the parties call the Collection Statute Expiration Date (CSED) Recovery Project.  They claim that the Commissioner established the project to correct IRS records, identify unreasonably extended statutes of limitation, and either refund or credit payments made.  The parties also claim that the Commissioner implemented a new policy where he would no longer rely on waivers solicited from taxpayers who had an installment agreement in place.[13]

---

[13] The parties fail to cite to any source documenting the existence of such a policy (as they describe it).  And even though we looked long and hard, we couldn't find one either.  Enforcing "policy" rather than "law" is also problematic--some courts have ruled that policies contained in the IRM (and the like) do not have the force of law and aren't binding on the Commissioner.  E.g., Fargo v. Commissioner, 447 F.3d 706, 713 (9th Cir. 2006), affg. T.C. Memo. 2004-13; Carlson v. United States, 126 F.3d 915, 922 (7th Cir. 1997).  But see sec. 6330(c)(1) ("The appeals officer shall at the hearing obtain verification from the Secretary that the requirements of any applicable law or administrative procedure have been met.").  The Commissioner made our job a bit easier by initially taking the position that although the Code did not foreclose his actions at the time, if "the consent was obtained by a threatened termination of an installment agreement, [he] would agree that the statute has expired in this case."  This position was not refuted at trial or on brief.  Instead, the parties chose to focus on the validity of the installment agreement:  "[The Commissioner's] position is that the decision was not an abuse of discretion, because the policy did not apply; the installment agreement was terminated before the waiver was signed."

The Taxpayer Advocate Service (successor to the IRS Problem Resolution Office), as part of this CSED Project, got the job of figuring out which waivers the IRS had unreasonably obtained. The taxpayer advocate sent Rosenbloom three letters. The first, sent in June 1998, told Rosenbloom that the Commissioner "may have made a mistake in handling [his] installment agreement." It stated "[t]he law permits the IRS to ask for an extension of the collection time limit before, not after, the installment plan begins. Our records indicate that * * * we may have improperly asked you to extend the legal time limit for collection of the taxes covered by this installment agreement." It even went on to tell him that he might be entitled to a refund of amounts improperly collected.

A couple of months later, the Commissioner fully abated Rosenbloom's taxes for 1977-80 and 1982-84 (i.e., years not at issue in this case).[14] Some of the installment payments that the IRS credited to the earlier years' tax liabilities were credited instead to 1986.

The second letter sent in August 1998, told Rosenbloom that the IRS needed more time to research his case. It seemed to acknowledge that the installment agreement was still in effect, telling him that "if you are making monthly payments to the

---

[14] Rosenbloom's first installment agreement covered 1977-79 and 1982-84; his second covered 1977-87. The tax debts that the IRS abated did not match the years covered by either.

Internal Revenue Service (IRS) under your installment agreement, you should continue."

The last letter, dated November 4, 1998, told Rosenbloom that "[w]e have determined that we did make a mistake." According to this letter, the Commissioner admitted that the IRS should not have asked Rosenbloom to extend the statute of limitations for collection of the taxes covered by "this installment agreement." He concluded that "the time limit for collecting the taxes you were paying under your installment agreement has expired. You are no longer required to make payments for these taxes and the IRS will take no further action to collect them. *You may consider this matter closed.*" (Emphasis is in the original). In contrast to the first letter, nothing happened administratively--either a refund or credit-- after this last letter.

The ambiguity in these letters is obvious: Rosenbloom had signed two waivers covering two different sets of tax years. The letters from the Taxpayer Advocate were imprecise in describing which waiver--and thus which tax debts--they were referring to. The Commissioner argues that they refer only to Rosenbloom's waiver of the statute for 1977-79 and 1982-83. Rosenbloom argues that the letters referred to a single installment agreement and draw no distinction between the tax debts covered by each waiver.

He does admit to being confused, and wrote the Service asking which years were involved.

He never heard back. And Segal contacted the Philadelphia Service Center, which told him that their review showed only the year 1989 was still open though neither Rosenbloom nor Segal received anything in writing to confirm this.

More time passed. When Rosenbloom had recovered enough to get back to work, the IRS noticed and sent him an unexpected letter in April 2002--a Final Notice of Intent to Levy to collect his still unpaid 1981 and 1985-87 taxes (plus a couple later years that became moot or that Rosenbloom does not challenge). Rosenbloom timely asked for a collection-due-process (CDP) hearing. He claimed that the assessments are barred by the expiration of the statute of limitations under the Commissioner's own CSED policy.

Revenue Officer H. died in 2003, and the Commissioner has either lost or destroyed the IRS collection files, the Problem Resolution files, and the Taxpayer Advocate files for this case. After Settlement Officer Ursula Wastian pondered the resulting mess (she was in charge of the CDP hearing), the IRS Appeals Office issued a notice of determination rejecting Rosenbloom's challenge and sustaining the proposed levy. Officer Wastian concluded without explanation that the statute had expired only for tax years 1977-80 and 1982-83, but not for 1981 and 1985-1987

because the letter from the Taxpayer Advocate "regarding the collection statutes related to earlier assessments and an agreement taken in the year 1988." She looked into IRS records and concluded that "the signed waiver for the [extension for 1981, and 1985-87] did not coincide with the dates installment agreements were entered into with the Service."

The notice of determination upheld the levy for the following unpaid tax liabilities:[15]

| Year | Liability |
|------|-----------|
| 1981 | $23,864.95 |
| 1985 | 185,765.49 |
| 1986 | 155,400.45 |
| 1987 | 271,253.10 |
| Total | 636,283.99 |

Rosenbloom, though currently a resident of Texas, where he works as a paralegal and investigator for a small law firm, was a resident of Illinois when he petitioned our Court. We tried the case in Chicago.

OPINION

Section 6502(a) generally gives the IRS ten years from the date of assessment to collect unpaid taxes. But there are

---

[15] The notice of determination also included a trust-fund-recovery penalty for 1984 (not included in Rosenbloom's petition to this Court) and liabilities for 1998 and 1999. On brief, the Commissioner recognized that the 1998 liability had been satisfied before trial, and Rosenbloom conceded the Commissioner's determination for 1999.

exceptions, and one is for taxpayers who voluntarily consent to extend the statute. Sec. 6502(a)(2). The CSED Recovery Project rested on the IRS leadership's conclusion that some revenue officers were systematically engaging in unfair collection and in some districts these practices were routine, entrenched, and condoned by management. In this case, the Commissioner is arguing that the CSED Recovery Project's policy doesn't apply to Rosenbloom's second installment agreement because that agreement was lawfully terminated before he signed the July 29, 1997 waiver.

Section 6159(b)(4) states that the Commissioner may terminate an agreement if the taxpayer fails to provide financial information as requested:

> The Secretary may alter, modify, or terminate an agreement entered into by the Secretary under subsection (a) in the case of the failure of the taxpayer--
>
> (A) to pay any installment at the time such installment payment is due under such agreement,
>
> (B) to pay any other tax liability at the time such liability is due, or
>
> (C) to provide a financial condition update as requested by the Secretary.

Section 6159(b)(5), however, requires the Commissioner to send a notice and explanation 30 days before he terminates an agreement:

            (5) Notice requirements.--The Secretary may not take
     any action under paragraph (2), (3), or (4) unless--

            (A) a notice of such action is provided to the
     taxpayer not later than the day 30 days before the date
     of such action, and

            (B) such notice includes an explanation why the
     Secretary intends to take such action.

     The preceding sentence shall not apply in any case in
     which the Secretary believes that collection of any tax
     to which an agreement under this section relates is in
     jeopardy.

     None of this made it into the notice of determination.

Instead, Officer Wastian noted that she secured Rosenbloom's case

history which, according to her, began in December 1999.  She

acknowledged that the relevant facts all occurred before then,

but concluded that "[t]here is no way to validate the statements

made * * * by the now-deceased field representative."  She also

undertook to examine the relevant tax transcripts, but found

nothing in them to upset her decision to sustain the notice of

levy.

     We review her decision for abuse of discretion, since

Rosenbloom isn't challenging his underlying tax liabilities.  See

Sego v. Commissioner, 114 T.C. 604, 610 (2000); Goza v.

Commissioner, 114 T.C. 176, 182 (2000).  A decisionmaker abuses

his discretion "when * * * [he] makes an error of law * * * or

rests [his] determination on a clearly erroneous finding of fact.

* * * [Or] 'applies the correct law to facts which are not

clearly erroneous but rules in an irrational manner.'"  United

States v. Sherburne, 249 F.3d 1121, 1125-26 (9th Cir. 2001) (quoting Friedkin v. Sternberg, 85 F.3d 1400, 1405 (9th Cir. 1996)); see also Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 402-03 (1990) (same).  And both parties agree that if the 1993 installment agreement was still in place when Rosenbloom signed the second waiver in 1997, the Commissioner's CSED policy dictates a conclusion that the statute has expired for the years at issue.

As to the scope of our review, we held in Robinette v. Commissioner, 123 T.C. 85, 101 (2004), revd. 439 F.3d 455 (8th Cir. 2006), that we are not limited to the administrative record in reviewing CDP determinations.  The Courts of Appeals for the First, Eighth, and Ninth Circuits disagree,[16] and have told us to apply the "record rule" when we try cases within their jurisdiction.  But this case would go to the Seventh Circuit.  Our Court's holding in Robinette is thus what we follow here, and we will consider evidence not produced at the CDP hearing if it is relevant to issues raised during the hearing, and is admissible under the Federal Rules of Evidence.  See Kovacevich v. Commissioner, T.C. Memo. 2009-160.

---

[16] See Keller v. Commissioner, 568 F.3d 710, 718 (9th Cir. 2009), affg. T.C. Memo. 2006-166, affg. and vacating on another ground decisions in related cases; Murphy v. Commissioner, 469 F.3d 27, 31 (1st Cir. 2006), affg. 125 T.C. 301 (2005); Robinette v. Commissioner, 439 F.3d 455, 460 (8th Cir. 2006), revg. 123 T.C. 85 (2004).

The Commissioner, however, can object to evidence that a taxpayer introduces for the first time in Tax Court on the ground that evidence not introduced at the CDP hearing is irrelevant to the question of whether that officer abused her discretion. Murphy v. Commissioner, 125 T.C. 301, 313-15 (2005), affd. 469 F.3d 27 (1st Cir. 2006). But in this case, the Commissioner didn't make that type of relevancy objection. We therefore move on--an evidentiary objection unmade at trial is waived.[17] Fed. R. Evid. 103(a); Kovacevich, T.C. Memo. 2009-160.

The settlement officer based her determination at least in part by concluding that Rosenbloom had only one installment agreement, the one signed in 1988.

> The taxpayer had entered into a payment agreement in 1988 * * *. The agreement * * * was for taxes that were assessed, due and owing at that time. The settlement Officer[18] conducted research and determined the Collection Statutes had expired for the years 1977, 1978, 1979, 1980, 1982, and 1983. She discovered that full abatements of all taxes due for these years was made in the sum of $432,078.40.

---

[17] We also note that neither party raised the Chenery doctrine as an issue for us to consider. Chenery, in the CDP context, would say that we can't uphold the notice of determination on grounds other than those actually relied upon by the appeals officer in making her determination. See SEC v. Chenery Corp., 318 U.S. 80, 87-88 (1943); Spiva v. Astrue, 628 F.3d 346, 353 (7th Cir. 2010) (agency has the responsibility to articulate its reasoning). But we haven't yet addressed the applicability of Chenery in CDP cases, and we are not going to start in a case where neither party made the argument.

[18] The Court notes that settlement officers, like judges, sometimes refer to themselves in the third person.

The letter regarding the collection statutes related to earlier assessments and an agreement taken in the year 1988 not the tax periods and assessments listed on the Notice of Intent to Levy * * *

This is an odd conclusion.  As Segal pointed out to her in 2003, the Commissioner had assessed Rosenbloom's giant tax debts for 1985 and 1986 only in April 1988, and his debt for 1987 only in January 1989.  Accumulating such debts would have defaulted the 1988 installment agreement, which required Rosenbloom to stay current on his taxes.[19]

This should have set off the settlement officer's internal alarm that she might be overlooking or misinterpreting relevant evidence, because Rosenbloom responded to Wastian's assertion that the years at issue weren't covered by an installment agreement by explaining that he had signed two installment agreements.  The

---

[19] Neither the IRS nor Rosenbloom still had a copy of the 1988 installment agreement.  But under section 6159(b)(4) a failure to pay taxes on time would be considered a default of the installment agreement.  Rosenbloom's 1993 agreement expressly states:

Conditions of this Agreement:

   *      *      *      *      *      *      *

All Federal tax returns and Federal taxes that become due while this agreement is in effect must be filed and paid on time.

   *      *      *      *      *      *      *

If the conditions of this agreement are not met, it will be terminated and the entire tax liability may be collected by levy * * *

Commissioner says that Wastian didn't look at the 1993 installment agreement simply because she didn't have it--it was part of the files that the Commissioner lost. And although she asked Rosenbloom for a copy of the agreement, he didn't give her one.

Rosenbloom and Segal finally found a copy of the missing installment agreement after the CDP hearing, and it was stipulated into evidence at trial. The agreement is on an IRS form, and has a box labeled "Tax Periods." The periods listed in the box include all the tax years from 1977 through 1987. The body of the agreement contains Rosenbloom's promise to pay $406 each month beginning on March 25, 1993. It is clear from this document that there was only one installment agreement in effect in 1997 and that it covered all the tax years covered by both waivers that Rosenbloom had signed. We have a definite and firm conviction that on this key point, the settlement officer clearly erred.

That might leave us with some tricky questions of whether it is legitimate for us to consider evidence outside the administrative record. But we don't think these questions need answering here. The settlement officer knew (or should have been able to tell) that the payments that Rosenbloom was making under some installment agreement were $406 each month. Even the surviving IRS records--accounts of Rosenbloom's tax debts organized by year--show that the IRS credited the $406 to several different tax years: mostly to 1977, but eighteen months' worth to

1980, four months' worth to 1984; and ten months' worth to 1986. The 1977 record also shows that Rosenbloom had been making monthly payments of $350 for years--right up to March 25, 1993, when they begin to show the start of $406 payments.  There really is only one reasonable conclusion--whatever installment agreement Rosenbloom had been under since 1988 was superseded by the 1993 agreement, which covered all the years for which Rosenbloom owed back taxes as of the date he signed it.

The Taxpayer Advocate's November 4, 1998 letter admitted that the Commissioner made a mistake by referring to only one installment agreement, not two.  But the IRS's abatement of Rosenbloom's tax debt for only some of the years covered by the installment agreement raises a serious question:  Is there some reason to cancel the waivers of the statute of limitations for 1977-79 and 1982-84 and not the waivers for the years at issue in this case?

The Commissioner argues that there is--that the IRS must have terminated Rosenbloom's 1993 installment agreement between the time that he signed the first waiver in 1996, and the time that he signed the second waiver in July 1997.  Why else, he argues, would even an aggressive revenue officer levy on a bank account or try to seize used office furniture, when he must have known that that would be contrary to the Code's prohibition on levies while an

installment agreement is in effect?  See sec. 301.6159-1(d),
Proced. & Admin. Regs., 59 Fed. Reg. 66193 (Dec. 23, 1994).

The solution to this puzzle lies in the tax transcripts that
the parties produced at trial.  These were the same tax
transcripts that the settlement officer had access to before
making her determination.  These transcripts are troves of
information, but they are also almost completely incomprehensible
to one not skilled at interpreting the various numerical codes
they use.  See Roberts v. Commissioner, T.C. Memo. 2004-100
(admitting evidence that helped identify entries in a transcript).
Whether or not our scope of review is limited to the
administrative record, taking testimony to explain that record is
allowed.[20]  And, after careful review, we conclude that the
transcripts show no termination of the 1993 installment
agreement.[21]  At trial, even the Commissioner's expert witness
conceded that "Code 64" (Defaulted Installment Agreement) is

---

[20] E.g., Yale-New Haven Hosp. v. Leavitt, 470 F.3d 71, 82
(2d Cir. 2006) (courts may consider extrarecord evidence to
illuminate agency's record); Franklin Savings Association. v.
Director, Office of Thrift Supervision, 934 F.2d 1127, 1137 (10th
Cir. 1991) (discussing exceptions to record rule); Bunker Hill
Co. v. EPA, 572 F.2d 1286, 1292 (9th Cir. 1977) (courts can go
beyond the administrative record to explain technical terms or
complex subject matter).

[21] Because we find the installment agreement was still in
effect at the time Rosenbloom signed the 1997 waivers, we also
find that H.'s abusive tactics also constituted a clear threat to
the continuance of the installment agreement when Rosenbloom gave
the waivers.

nowhere to be found in them.  The Code "Status 26," dated May 6, 1996, is an entry for all the years covered by both sets of waivers.  The Commissioner's expert wrote in his report that this indicates that the installment agreement was no longer in effect, but at trial he conceded that in this case "Code 26" meant that the case had been transferred to the local Chicago office.  By itself, this would be an ambiguous bit of information--simply evidence that control over the installment agreement had passed into local hands, but evidence of neither its continuation nor its termination.[22]

His concession on this point ties into a distinction made in the IRM from that era that distinguishes between installment agreements monitored by the IRS computer system and those monitored manually.  2 Administration, IRM (CCH), pt. 5, sec. 5339, at 6546 (Dec. 11, 1992).  According to the IRM, only taxpayers with manually monitored agreements would get the Letter 1064 (DO) that set Rosenbloom off in May 1997.  Id.  The entries record Rosenbloom's continuing to make $406 monthly payments before and after he signed the July 1997 waiver.  The IRS transcript of Rosenbloom's account for those years confirm this,

---

[22] If the expert had stood by his report, he'd have been in the odd position of saying that something happened to default the installment agreement between March 6, 1996 (when Rosenbloom signed the first set of waivers) and May 6 of the same year.  Yet the records show no correspondence, and no interruption of payments from Rosenbloom in that short time.

and would make no sense if "Code 26" meant there was no installment agreement in place.  The additional fact that there is no "Code 64" on any transcript for any year is consistent with Rosenbloom's story--that he received a notice of default, which stated that his installment agreement might be terminated, not that it *was* terminated.  We therefore conclude that the settlement officer clearly erred in her implicit conclusion that there was no installment agreement in effect when Rosenbloom signed the second set of waivers.

The Commissioner next argues that the Taxpayer Advocate's letter was "sent in error," or alternatively, that it refers to the "earlier years" rather than the later years (or the ones at issue in this case).  He points to several clues.  First, he says the letter suggests that Rosenbloom was still making payments on the installment agreement, when he hadn't made any payments for nine months.  It does not.  It is instead phrased in the conditional--"if you are making monthly payments".  Second, he says the letter states that the time limits for collecting the taxes covered by the installment agreement had expired.  But even without considering the waivers to extend the statute, he argues the statute hadn't expired for 1982 and 1987 because the IRS hadn't actually assessed the tax for those years until late 1988 or January 1989.

We acknowledge this point, but do note that the IRS letters appear to be forms, and do not think the Taxpayer Advocate put much effort into customizing them to Rosenbloom's situation. Correspondence in a case this complicated is likely to have some infelicities of phrase, but they can't obscure the fact that the IRS's own transcripts show that Rosenbloom and his lawyer both reacted in that summer as if the installment agreement were tottering on the edge of default, not that it had already toppled over.

The Commissioner's final argument relies on the flush language of section 6159(b)(5)--the language that authorizes the Commissioner to terminate an agreement without notice if he believes that tax collection is in jeopardy. He argues that this must have been what triggered the bank levy in August 1997, and is proof that the installment agreement was terminated by that time.

The actions referred to in this flush language, however, require notice to the taxpayer before the Commissioner terminates an installment agreement. The argument that the bank levy is evidence of a jeopardy termination might be convincing if the levy had occurred in June or July. But Segal had sent Rosenbloom's updated financial information to H. well before the levy. That the levy occurred close to two months after Rosenbloom sent the missing information to the IRS isn't consistent with a jeopardy termination. We find instead that the bank levy is better

explained as another example of the heavy-handed manner in which that particular revenue officer was pursuing Rosenbloom.  We conclude that the bank levy in August was not evidence that the installment agreement had been terminated.

We therefore conclude that the determination to sustain the levy was an abuse of discretion for the years included in the set of waivers that Rosenbloom signed in 1997.

<u>An appropriate decision will</u>

<u>be entered</u>.